IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Crystal D. Anglin,<br><br>                 Plaintiff,<br><br>vs.<br><br>Carolyn W. Colvin,<br>Commissioner of Social Security,[1]<br><br>                 Defendant. | Civil Action No. 6:12-1027-SB-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

       This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

       The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

       The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on October 26, 2009, alleging that she became unable to work on July 6, 2009. The applications were denied initially and on reconsideration by the Social Security Administration. On September 13, 2010, the plaintiff

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Karl S. Weldon, an impartial vocational expert, appeared on July 22, 2011, considered the case *de novo*, and on January 18, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on April 5, 2012. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.
>
> (2)    The claimant has not engaged in substantial gainful activity since July 6, 2009, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq* and 416.971 *et seq*.).
>
> (3)    The claimant has had the following severe combination of impairments: morbid obesity, anxiety, and depression (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).
>
> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b). I find the claimant retains ability to lift and/or carry 20 pounds on an occasional basis, lift and/or carry 10 pounds on a frequent basis, stand/walk with normal breaks at least 2 hours out of an 8-hour workday, and sit with normal breaks for about 6 hours out an 8-hour workday. The claimant is limited

to occasional postural activities with the exception of climbing ropes, ladders, or scaffolds, which is limited to never. The claimant should also avoid concentrated exposure to hazards. The claimant has mild-to-moderate mental limitations. She can concentrate, persist and work at pace to perform simple, routine, repetitive tasks at level 3 common sense reasoning as defined by the *Dictionary of Occupational Titles* for extended periods of 2 hours in an 8-hour workday. She can interact occasionally with the public and interact appropriately with coworkers and supervisors in this type of stable, routine setting.

(6)     The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)     The claimant was born on February 3, 1981, and was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)     The claimant has a limited education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 C.F.R. §§ 404.1568 and 416.968).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a)) and 416.969(a))..

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from July 6, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920.  If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was born in 1981 and was 28 years old on the date of her alleged onset of disability and 30 years old on the date of the ALJ's decision (Tr. 27, 159). The plaintiff has an 8th grade education and has worked as a cafeteria attendant, fast food cashier, and kitchen helper (Tr. 41, 68-69, 223, 293).

In August 2009, the plaintiff presented to University Medical Group regarding her amenorrhea (absence of a menstrual period) and obesity (Tr. 401). She was five feet and three inches tall and weighed 366 pounds. She denied any pain. Her physical exam was essentially normal, with no edema and normal range of motion in the extremities. A mental status exam showed that she had good judgment, intact recent and remote memory, and no depression, anxiety, or agitation (Tr. 401-02).

In October 2009, the plaintiff presented to Greenville Mental Health Center with complaints of depressed mood, difficulty sleeping, and decreased appetite. The plaintiff's diagnoses was sexual abuse of a child victim and depressive disorder NOS. She was discharged in February 2010, when she dropped out of treatment (Tr. 533-34).

In March 2010, licensed clinical psychologist Renuka Harper, Ph.D., examined the plaintiff at the request of the State agency. The plaintiff stated that she was "really depressed and stressed out." She stated that she helped with chores around the house, including vacuuming, cleaning her room, and doing the laundry. She cooked most of her meals and shopped once a week. She drove a car and attended church once a week. She had friends from church and went out to lunch once a week. She also went to movies and enjoyed reading Christian books and caring for elderly people. Dr. Harper found that the plaintiff was mildly depressed and her ability to focus her attention was good. Dr. Harper diagnosed the plaintiff with major depressive disorder, moderate; posttraumatic stress

disorder; and probable borderline intellectual functioning. Dr. Harper concluded that the plaintiff

> • was able to understand, remember, and carry out simple instructions,
> • had concentration adequate for simple tasks,
> • participated in social activities on a regular basis and did not report difficulties going out in public,
> • was capable of relating appropriately to co-workers and supervisors,
> • was able to carry out most activities of daily living independently; and
> • had only mild limitations in independent functioning

(Tr. 574-76).

In April 2010, Robbie Ronin, Psy.D., a State agency psychologist, reviewed the medical record and completed a Psychiatric Review Technique form ("PRTF") (Tr. 577-90). Dr. Ronin found that, under the "B" criteria of the Listing of Impairments, the plaintiff had "mild" restriction of activities of daily living, "moderate" difficulties in maintaining social functioning, "moderate" difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation (Tr. 587). Dr. Ronin also completed an assessment of the plaintiff's mental functional capacity, concluding that the plaintiff's mental impairments were severe, but did not preclude the performance of simple, repetitive tasks, or the ability to interact appropriately with co-coworkers or supervisors (Tr. 591-93). In August 2010, another State agency psychologist, Maryanne Bongiovani, Ph.D., reviewed the record and concurred with Dr. Ronin's assessment (Tr. 1014-15).

Dale Van Slooten, M.D., a State agency physician, reviewed the medical record in May 2010 and concluded that the plaintiff was capable of performing a limited

range of light work[3] (Tr. 620-27). Dr. Van Slooten explicitly considered the plaintiff's obesity (Tr. 625). In August 2010, a second State agency physician, Saba Kulathungam, M.D., reviewed the record and affirmed Dr. Van Slooten's opinion (Tr. 1013).

The plaintiff was initially evaluated at Greenville Mental Health Center in June 2010 for complaints of depression and suicidal ideation (Tr. 1002). She also presented to the emergency room in March 2011 with suicidal ideation. She denied being suicidal and denied a history of suicidal ideation. She was diagnosed with major depression, prescribed medication, and was discharged in stable condition with instructions to follow-up at the mental health center (Tr. 1046-47).

Joseph Hammond, Ph.D., examined the plaintiff in August 2011 at the request of the State agency. The plaintiff reported that she washed dishes, did laundry, and shopped for groceries independently. Dr. Hammond noted that the plaintiff was hospitalized for psychiatric reasons at the age of 12, and she had been a client at the Greenville Mental Health Center for four to five years for treatment of depression. The plaintiff took Celexa but reported it was not helpful. She spent most of her time with her grandmother. IQ testing revealed that the plaintiff had a full-scale IQ score of 49. The plaintiff had inadequate effort on a Dot Counting Test. Dr. Hammond could not give a diagnostic impression due to invalid test results and significant discrepancies between test results and reported functioning (Tr. 1048-51).

Dr. Hammond completed a medical source statement, indicating that the plaintiff had

> • no restriction in her ability to understand and remember short, simple instructions;

---

[3] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

> • slight restriction in her ability to carry out short, simple instructions;
> • moderate restriction in her ability to understand and remember detailed instructions; and,
> • moderate restriction in her ability to interact appropriately with the public

(Tr. 1053-55).

At the July 2011 hearing, the plaintiff testified that she had difficulty comprehending and concentrating in school and difficulty keeping pace in her prior jobs (Tr. 40, 43). She was five feet and three inches tall and weighed 400 pounds. She had a history of suicidal ideation and heard voices that were not there. She testified that she lived with her grandmother, and she did no household chores (Tr. 46-50). She further testified that she had no hobbies and did not read and had no friends (Tr. 51).

The plaintiff testified that she had generalized level "8" pain for which she took over-the counter aspirin. She was depressed. She could not walk for more than five steps at a time, could not stand for more than three to four minutes at a time, and could not sit for more than 20 minutes at a time. She could lift no more than five pounds (Tr. 59-60, 63-64).

The ALJ asked the vocational expert to consider a hypothetical individual who was the plaintiff's age, with the same education, and work experience as the plaintiff. The hypothetical individual also was assigned the following limitations: lift and carry up to 20 pounds occasionally and 10 pounds frequently, stand/walk with normal breaks about 2 hours out of an 8-hour workday; sit with normal breaks for about 6 hours out of an 8-hour workday; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, scaffolds, or ropes; avoid concentrated exposure to hazards; concentrate, persist, and work at pace to perform simple, routine, repetitive tasks at level 3 common sense reasoning for extended periods of 2 hours in an 8-hour workday; and occasionally

interact with the public and interact appropriately with co-workers and supervisors in this type of stable, routine setting (Tr. 69-70).

The vocational expert responded that the individual could perform certain unskilled,[4] sedentary[5] jobs, including assembler (*Dictionary of Occupational Titles* ("*DOT*") # 739.684-094) (1,200 jobs regionally and 288,000 jobs in the United States); inspector (*DOT* # 726.684-050) (1,800 jobs regionally and 362,000 jobs in the United States); and machine operator (*DOT* # 690.685-194) (1,400 job regionally and 242,000 jobs in the United States) (Tr. 71).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to find her disabled under the listing for mental retardation; (2) failing to find her disabled under the listings for effects of obesity; (3) ordering the Test of Memory and Malingering; and (4) failing to make a proper credibility determination.

*Mental Retardation*

The plaintiff argues that the ALJ committed reversible error by failing to find her disabled under Listing 12.05 (Mental Retardation). The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. § 404.1520(d). To show that an impairment is "equivalent to a listed impairment, [a claimant] must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment."

---

[4] Unskilled work is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a), 416.968(a)

[5] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking a standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id*. §§ 404.1567(a), 416.967(a).

10

*Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (citation and internal quotation marks omitted) (emphasis in original).

> Listing 12.05 provides as follows:
>
> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
>> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>>
>> OR
>>
>> B. A valid verbal, performance, or full scale IQ of 59 or less;
>>
>> OR
>>
>> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>>
>> OR
>>
>> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>>
>>> 1. Marked restriction of activities of daily living; or
>>>
>>> 2. Marked difficulties in maintaining social functioning; or
>>>
>>> 3. Marked difficulties in maintaining concentration, persistence, or pace; or

>   4. Repeated episodes of decompensation, each
>   of extended duration.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05.

As set forth above, to meet the diagnostic description of mental retardation, an individual must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period [i.e., onset before age 22]." *Id*. "If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria [paragraphs A through D], we will find that [the] impairment meets the listing." *Id.* § 12.00(A).

> Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation. Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.

American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* (4th ed. Text Revision 2000) (DSM-IV-TR).

As argued by the Commissioner, the plaintiff can point to no record evidence demonstrating that she met the diagnostic criteria of mental retardation. Although she obtained a full scale IQ of 49 when Dr. Hammond performing IQ testing in August 2011, he found that the plaintiff's test results were invalid due to "significant discrepancies between test results and reported functioning" (Tr. 1051). Moreover, the record does not show significant deficits in the plaintiff's adaptive functioning. Her school reports reveal that she finished the eighth grade in regular classes and was promoted to the ninth grade (Tr. 293). She admitted that she could read and write (Tr. 52). Her work history reports show that she was able to engage in substantial gainful activity for several years as a cafeteria attendant, cashier, and kitchen helper (Tr. 176, 210-11, 229). Also, when examined by Dr. Harper in March 2010, the plaintiff reported that she managed her own medications, paid for items

independently and could get correct change, and drove a car without any problems (Tr. 575). Dr. Harper concluded that the plaintiff was able to understand, remember, and carry out simple instructions but would have difficulty with more complex or detailed tasks. Dr. Harper further found that the plaintiff was capable of relating appropriately with co-workers and supervisors in a work environment, and she had only mild limitations with respect to independent functioning (Tr. 575). Based upon the foregoing, the plaintiff has failed to show that the ALJ committed reversible error by failing to find that her impairments met or were equivalent to Listing 12.05.

*Obesity*

The plaintiff further argues that the ALJ erred in failing to find her disabled under Listings 1.00(Q) and 3.00(I). Listing 1.00(Q) states:

> Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(Q).

> Listing 3.00(I) states:
>
> Obesity is a medically determinable impairment that is often associated with disturbance of the respiratory system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with respiratory impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's

> residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

*Id.* § 3.00(I).

Social Security Ruling ("SSR") 02-1p recognizes that obesity may be a factor in both "meets" and "equals" determinations at step three of the sequential evaluation process. The Ruling states:

> Because there is no listing for obesity, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental disorders.

SSR 02-1p, 2000 WL 628049, at *5. The Ruling further recognizes that obesity can cause limitations of function in sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, balancing, stooping, crouching, manipulating, as well as the ability to tolerate extreme heat, humidity, or hazards. *Id.* at *6. These issues must be considered in assessing a claimant's residual functional capacity. *Id.* The Ruling further states that "individuals with obesity may have problems with the ability to sustain a function over time" and that "[i]n cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity." *Id.* The Ruling also states:

> The combined effects if obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

*Id.* Further, "[a]s with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." *Id.* at *7.

14

The ALJ specifically considered the plaintiff's obesity at step three of the sequential evaluation process and in determining her residual functional capacity (Tr. 19, 23-24). The ALJ found that the plaintiff's morbid obesity was the only severe physical impairment with limiting symptoms (Tr. 23). Based upon the plaintiff's alleged generalized pain and morbid obesity, the ALJ limited the plaintiff to a range of light work with standing and walking limited to two hours out of an eight-hour day and occasional postural limitations and never climbing ladders, ropes or scaffolds (Tr. 23). The ALJ noted that while the plaintiff did allege some generalized pain, there were no medical records suggesting an etiology for the pain other than her obesity. The ALJ also noted that when the plaintiff was examined in August 2009, her physical exam was essentially normal, with no edema and normal range of motion in the extremities (Tr. 402). She also had normal range of motion when examined in September 2009 (Tr. 386). Records from an office visit in April 2010 showed the plaintiff was able to walk four miles (Tr. 599, 1013). The ALJ gave significant weight to the assessments of State agency consultants Drs. Van Slooten and Kulathungam, who considered the plaintiff's obesity and concluded that she was capable of performing a limited range of light work with occasional postural limitations and never climbing ladders, ropes, or scaffolds (Tr. 24, 620-27, 1013-15). Based upon the foregoing, the ALJ properly considered the plaintiff's obesity (Tr. 23-24).

*Credibility*

The plaintiff argues that the ALJ erred in ordering the Test of Memory and Malingering ("TOMM") and in making his credibility determination. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or

15

> psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

  (1)  the individual's daily activities;

  (2)  the location, duration, frequency, and intensity of the individual's pain or other symptoms;

  (3)  factors that precipitate and aggravate the symptoms;

  (4)  the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

  (5)  treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

    (6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

    (7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

At the hearing before the ALJ on July 22, 2011, the ALJ noted that he was going to send the plaintiff for a consultative psychological examination (Tr. 73-74). On August 17, 2011, Dr. Hammond conducted the "Adult Psychological Evaluation with Medical Assessment and TOMM" (Tr. 1048-55). The plaintiff argues that the ALJ erred in ordering the TOMM test from Dr. Hammond because it is the Social Security Administration's ("SSA") policy to not use the TOMM.[6]

In his report, Dr. Hammond noted that on the Reading section of the Wide Range Achievement Test-II the plaintiff obtained a standard score equal to 69, and her composite scores on the Weschler Adult Intelligence Scale ranged from a high of 66 to a low of 49. Dr. Hammond stated these scores were not valid. On the "Dot Counting Test," Dr. Hammond stated the plaintiff's performance "was not consistent with adequate effort.

---

[6]The January 26, 2012, Administrators' Letter No. 866 from the SSA's Office of Disability Determinations to the State Disability Determination Services ("DDS") Administrators states in pertinent part:
> SSA does not support the purchase of tests for malingering or credibility. While the results from these tests can provide evidence suggestive of poor effort, or of intentional symptom manipulation, results from such instruments are not programmatically useful in resolving the issue of the credibility of an individual's statements.
> ***
> The DDS must:
> • Remove malingering and credibility tests from fee schedules and from the list of test options in their legacy systems. e.g., . . . TOMM
> . . . .
> • If the DDS receives a request to purchase a malingering or credibility test . . . :
>     • the DDS should **not** purchase the test . . . .

(doc. 15-2) (emphasis in original).

17

For example, miscounted five of six sets of group dots and four of these were off by a unit equal to 1 (which probably represent Ganser-like responses)." She was also administered "the TOMM." The plaintiff's performance on the TOMM was "inconsistent with adequate effort." Dr. Hammond concluded the plaintiff had "significantly invalid test results" and that "she did not maintain concentration, persistence or adequate pace." He concluded that a diagnostic impression was "[n]ot possible to determine due to the presence of significantly invalid test results and significant discrepancies between test results and reported functioning" (Tr. 1048-52).

In assessing the plaintiff's credibility, the ALJ found that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the [ALJ's] residual functional capacity assessment" (Tr. 22). The ALJ noted inconsistencies between the plaintiff's statements in the record and her testimony at the hearing (Tr. 23). For example, the plaintiff testified that she had no hobbies and did not read (Tr. 50); however, she told Dr. Harper, an examining psychologist, that she enjoyed reading Christian books, going to the movies, and caring for the elderly (Tr. 575). She testified that she had difficulty walking more than five steps at a time (Tr. 63); however, she reported to a health care provider in April 2010 that she had walked four miles (Tr. 599). She testified that she had no friends (Tr. 51); however, she told Dr. Harper that had friends from church and went out to lunch once a week (Tr. 575). She testified that she performed no chores, not even making her bed (Tr. 46-47); however, she told Dr. Harper that she helped with chores around the house, including vacuuming, cleaning her room, and doing the laundry (Tr. 575). She testified that she had level "8" pain; however, her pain level was "0" when seen in the emergency room four months earlier in March 2011 (Tr. 1046). She testified that she never held a job for very long because she could not keep up with the pace (Tr. 43-44); however,

her earnings records indicated that she worked for several years at substantial gainful activity levels (Tr. 176, 201). The ALJ also noted that the record indicated the plaintiff lied during her initial intake interview with the SSA (Tr. 217-20)[7] and that the plaintiff initially reported that she did not receive unemployment benefits, which was contrary to her earning records (Tr. 54, 172-202; *see* Tr. 23).

The ALJ also noted that the plaintiff's pain complaints were inconsistent with the objective medical record (Tr. 23-24). For example, when examined in August 2009, her physical exam was essentially normal, with no edema and normal range of motion in the extremities (Tr. 402). She also had normal range of motion when examined in September 2009 (Tr. 386).

The ALJ found that the plaintiff's daily activities were inconsistent with her alleged disabling mental impairments (Tr. 24-25). The plaintiff reported to Dr. Harper that she helped with chores around the house, including vacuuming, cleaning her room, and doing the laundry; she cooked most of her meals and shopped once a week; she drove a car and attended church once a week; she had friends from church and went out to lunch once a week; she also went to movies, and enjoyed reading Christian books and caring for elderly people (Tr. 574-5).

The ALJ found that the plaintiff's lack of effort during Dr. Hammond's examination further eroded her credibility and noted Dr. Hammond's findings of inadequate effort, invalid test results, and discrepancies between test results and reported functioning (Tr. 23). As argued by the Commissioner, while the plaintiff faults the ALJ for relying on Dr. Hammond's opinion, Dr. Hammond's conclusions were reached after comprehensively interviewing the plaintiff and performing a number of diagnostic tests, including the TOMM, rather any single test. To the extent that the ALJ may have improperly relied on the TOMM

---

[7]The interviewer noted, "Claimant seemed to be cooperative but lied about several things which I had to go back to correct" (Tr. 219).

test administered by Dr. Hammond, the court finds this error to be harmless because the ALJ gave several other reasons for his credibility finding that were supported by substantial evidence. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

In determining the plaintiff's mental capacity for work, the ALJ gave significant weight to the opinion Dr. Ronin, a State agency psychologist who reviewed the medical record in April 2010, including Dr. Harper's evaluation, and concluded that the plaintiff could perform simple, repetitive tasks, and interact appropriately with co-coworkers or supervisors (Tr. 24-25, 593). As noted above, Dr. Harper concluded that the plaintiff was able to understand, remember, and carry out simple instructions but would have difficulty with more complex or detailed tasks. Dr. Harper further found that the plaintiff was capable of relating appropriately with co-workers and supervisors in a work environment, and she had only mild limitations with respect to independent functioning (Tr. 575).

Based upon the foregoing, this allegation of error is without merit. Moreover, substantial evidence supports the ALJ's assessment of the plaintiff's residual functional capacity to perform a limited range of light work with occasional postural limitations and never climbing ladders, ropes, or scaffolds, and further limited to simple, routine, repetitive tasks at level 3 common sense reasoning as defined by the *DOT* for extended periods of two hours in an eight-hour workday, with only occasional interaction with the public.

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

April 17, 2013                                          s/ Kevin F. McDonald
Greenville, South Carolina                      United States Magistrate Judge